Case number 21-1209. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local 627, Petitioner versus National Labor Relations Board. Mr. Rosenfeld for the petitioner, Mr. Heller for the respondent. David Rosenfeld for the petitioner, second time here. This case has been going on since 2010 when this dispute began. We're only looking for a remand so that the board can reconsider its position and decision to come up with a more rational explanation of what happened here. I think the board misunderstood to some degree what Section 8F really expects, and that is that if an employer wants to either go non-union, which they're permitted to do, that is to go up and shop, or sign with a different union, there's a few cases we've cited in the brief that kind of explain and reflect this process, although it was not done correctly by the union involved, and that is if the employer already has a workforce and the employer wants to shift unions, in that case it was an employer, two employers, Garner Morrison and Raymond Interiors, they're both cited in the brief, wanted to dump the painters union and go with the carpenters. So they recognized the carpenters, but the important difference was that they didn't destroy, terminate, discharge their workforce. Seamless transition to the carpenters. One day they're represented by the painters, the next day by the carpenters. The problems in the case come from the way the carpenters implemented their agreement, because they asserted union security and some other provisions prematurely and unlawfully, the problems in this case. But those two cases illustrate that the proper way to deal with this kind of a transition is you keep the workforce, you apply the new contract, the new terms of the contract, if there's union security, you apply that correctly, and it's a seamless transition without any discharge of the employees. Doesn't the case boil down to a fact question about why these welders were let go? You say it's because of their union affiliation. The other side says it's because of the ADAF policy. It's just a fact question that was resolved against you. Well, if there is a fact question, the question is, what was the reason for the termination? Right. And I think the board kind of mangled it trying to respond to that question. For example, you don't think the board answered that question adversely to you? The board answered that question adversely on a fact question. Yes. But it's rationale for accepting it. The board said was that the employer had a past practice of operating under the terms of a collective bargaining agreement. What the board didn't find, however, and couldn't was what happened if the company had a policy or practice of what happens if there wasn't an agreement in effect. But we do know that the majority in the decision reflects on the fact, because this court said that, that there were times when the employer had operated without the terms of an agreement because it kind of said we have a good relationship with unions, we expect there'll be a contract, non-employee agreement, and that testimony is actually going to appendix 152 with the president of the company, Manman A. Wilson, said there have been some times in the past when we've operated without an agreement. So I just want, Judge Katz's question I think was, do you have any dispute with the board other than over a fact question? And I think the answer is you do not have any dispute with the board other than a fact question. We have lots of disputes about the way they apply the factual findings here in terms of legal analysis of what happens as to why these employees are terminated. And the board's finding was that they were terminated because the employer didn't operate without the terms of an agreement. But we know that that's both inaccurate, because there were times when it operated, and we know that... Just a little bit more precisely, the board found that the general counsel has failed to demonstrate anti-union motive, which is the essential element of your claim. And I think the record convincingly demonstrates to the contrary for a number of reasons. Sure, and I mean, I promise I'll let you argue the facts, but I'm just trying to establish that that's what we're talking about. But let's look at this gap period argument for a minute. Although client dredging says we only operate under the terms of an agreement, they don't establish what happens if we don't. But what we do know is that every time for the last 25 years when there's been no work available, there's never been a discharge. It's always been allowed. And that's reflected in about 15 pages in the joint appendix from where we have these employee cards showing their work history. And you'll see some workers going back to the 1990s who were laid off for lack of work, came back, laid off, lack of work. And one kind of irony about this case, if you look at 399 to 400 and a couple other places in the record, you'll find that some of these workers were pipefitters, who were laid off, and then rehired, laid off and rehired. And then they became boilermakers, and they were laid off and calling layoff. In fact, would have to go back through the union hiring hall before they would get dispatched again. And that is that right? Yes. And that's what was the catch here, your honor. Had they been terminated in this, you're terminated, you also just have to go back to the union hire. If a contract ends, you're terminated. You go back to the union hiring hall to get sent back out again on your native subject to complying with the hiring hall requirements. But you go through. Well, let's just confirms my point. You have to go through the hiring hall, which means you have to meet hiring hall requirements, not in a layoff situation. But they did in this case, as I said, J 155 when they were laid off in previous instances, um, layoff. We were done. We go back to the hiring hall for going back. Oh, aren't you know that meant if you were laid off and you didn't have work for Hawaiian dredging, you can go back the hall and find work elsewhere. But when Hawaiian dredging laid these workers off, it would often recall them directly because it wanted to keep the same workforce. And that's what sort of animates. Where is that in the record? Pardon? Where is that fact in the record? It's not. We call them directly rather than the testimony we have that they would go back to the hiring hall. I thought that was a reference going back to the hall. Maybe that's what maybe that's what it was. But you just made a different representation. I'm wondering where that is. I don't think the collective bargaining agreement that's in the record required in a layoff. The employer had to call the hawk. There's nothing on those slips indicating that the hall was called and that they were referred as new hires because they weren't treated as new hires. I'm sorry, one more time. You say the collective bargaining agreement said you don't have to go back to the hiring hall. I haven't looked at in a while, but the Boilermaker agreement, which is the one that did not require that workers went back to the hall to go back to a former employer for whom they've worked. It did require they go back to the hall to be dispatched to a new employer. On this point, what do you do with footnote 29 of the board's decision, which says that in this case, there would have been no difference from the workers' perspective between a layoff and a discharge? Well, there wasn't quite a big difference because they were discharged. They had no reason to believe they'd ever go back to line dredging. They were formally severed. They had no knowledge that they could ever be rehired. And what we do know is that that was contrary to actually what Hawaiian Dredging wanted. They wanted to keep the workers. But here, Your Honor, is what happened. The day after they sent the letter of termination, we suspect this was, I mean, they knew what was going on. They're a very experienced construction industry employer. They met with the pipefitters the next day and said to the Reggie Castaneras, the business manager, said, under no circumstances can you do that. And this is what is critical to this case, in which is contrary to the board's underboard express, he finds that at no point did he ever say that you had to be a full member of the union. Because we know, based on union starts, and actually an earlier Boilermaker case called Boilermaker's Local 749, which this court decided in 72, just before I started practice, that you can't condition referral on membership. You can condition on other things. And Castaneras says repeatedly that as a condition of these guys getting referred, they have to join the union, said membership. This is the record at 152. It's at, when this case was pending, Hawaiian Dredging filed a motion for summary judgment. In fact, Mr. Castaneras' affidavit was joined Appendix 319. They met the requirements of membership. He states in his application that it would refer all qualified individuals who completed the local 675 membership application process. But they knew from February 18th on that the pipefitters had imposed an unlawful requirement on rehiring them. And we know that the Boilermaker... Maybe I'm missing something very basic, but I thought it was just built into ADAPT that the union and the employer can require workers to be a member of the union as a condition of getting that work. No, but ADAPT says, yes, you can condition it, but not initially. You have to let them have this grace period. A seven-day grace period. Right. But the problem with Mr. Castaneras said unequivocally, both in the trial testimony and his testimony, told the company that on February 18th, subsequent February 23, no, membership application is a condition of referral. We don't allow people to sign up until they've met the application process, they've gone through an interview, and they've passed the welding test. But that doesn't mean necessarily they had to be sort of full-blown members of the union. That could be that it's allowed an AFRU. I'm actually not joining the union, but you have to pay certain fees, and then you go through the hiring hall. And that may have been, it's not crystal clear what the reference, how membership was being used in that letter was. It could have included both the formal members and the ones who are, have sort of a membership light with the union, because they don't want to be full-fledged members, but still the union has an obligation to let them use the hiring hall and to refer them without discrimination through that hiring hall. And that's the point the Labor Board makes in the brief, that if you read the suggests that full members isn't initially required only after eight days. The problem you have in this case... Well, it's not even after eight days. Someone could still say, I just don't like being a member of unions, but I will pay the required fees. And then the pipe fitters, or the boiler makers, when they were running the hiring hall, will still have to let them use the hiring hall and refer them through in a non-discriminatory manner, right? Am I right? Right, you're right. Okay, so we don't know that that's, that may have been all that was meant by that language. Well, we do know that because there's a place in the record where when Mr. Castaneros was asked that question in the trial transcript, he says expressly that it includes membership, full membership. That's what he says it means. I don't know what to do except to say that the pipe fitters understood that to mean full membership and an application. The word application is not a term of art, particularly what may be is a term of art, but application means application to be a member. It doesn't mean application to pay dues and be a non-member. The word application means I'm joining the union. That's what Union Start says, that's what Boilermaker 749 says. I'll say that. What is the relevance of this given that there was no agreement with the pipe? I know you think they may have been talking, but that wasn't resolved, that fact wasn't found in your favor. But even assuming it was, there was no agreement yet with the terminations happened. So we're really looking at Hawaiian, we're not looking at pipe fitters intent, we're looking at Hawaiian dredgings. That goes back to Gardner, Morrison, Raymond, these other cases. Transitions between one union or the union. They're always seamless in the sense that the employees are always offered the opportunity to keep working. Hawaiian dredging instead of going through that process, which was well known in this under 8F construction industry, terminated the employees, discharged them. Because they knew that the pipe fitters were going to impose this requirement. That's a fact that is not in the record. No. They knew that this was going to happen. It's just that hasn't, that fact hasn't been found for you. So we can't rely on that and what we can rely on is the fact finding that they were terminated because Hawaiian dredging's work, welding work, had ended. That's, that's not. Because it didn't have an 8F agreement. It was not doing any welding work, whether it be for a week or a month or a year. Hawaiian dredging's welding work was still in existence. In fact, the workers themselves closed the jobs down in a way to leave them open to restart them. It took the time to do the right thing and close them down safely. The work was there, it was just Hawaiian dredging chose not to do it. And as I said, the record shows whenever Hawaiian dredging never ceased doing work, that it ceased operating for whatever reason, it laid workers off to the expectancy of recalling them to bring them back to do that work or other work. And that happens routinely in construction jobs. Material isn't available, whether welding is. You said the employees kept working, but actually I thought that there was something in the record about how during some period of time, Hawaiian dredging kept asking boilermakers to have their employees show up to work and the boilermakers kept having their The boilermakers didn't believe there was an agreement, so they took job action. And I want to emphasize that that shows union motivation. When the letter was sent to the boilermakers on February 17th, the company said, we just can't get an agreement. And their internal memos in the record showing that they were quite dissatisfied with the bargaining strategy. I appreciate that. Let me ask a question very much in the abstract, even though I do think this is probably a case about disagreeing. Imagine it's not this case. Imagine there's a construction company. I just want you to tell me at the end of this, if any of this policy is illegal. I'm a construction company. I use ADAPT. I have a policy. I do it for years. Here's what I do. I reach a collective bargaining agreement with a particular union. That union then basically picks which employees show up to work. I basically outsource my hiring to that union. Then that collective bargaining agreement expires. And at that point, I can terminate the bargaining relationship. I stop work. At that point, there is no work ongoing. There's no work even to be done. I reach out to a new union. I reach a new collective and that union picks which employees will show up for work. Is anything about that illegal? That could happen that if the work totally dried up, basically shut my business down for a while and assigned to the new union, no problem, because I initially discharged my employees saying I've got no work, no prospect of work. But Hawaiian dredging policy, if I may use a few more words, the operating union, we're not disputing that. We understood that. But if I'm an operating union, I'm going to pretty quickly from February 17th have a union to operate under to do my welding work, which I've paused. So it wasn't a matter that I didn't need the workers. It was that I was just pausing to sign with a new union. But in doing the pausing, I discharged my workers rather than saying to them, we're going to sign with a new union, we're laying you off. You may have work in the future. And what the board says is that the why they said layoffs were not necessarily appropriate. The board's rationale is not acceptable. They simply said, well, we don't need to, the employer didn't need to explain why layoff versus discharge. That's not a rationale because we all know, I think, that there's a huge difference to workers whether you're laid off, expecting to come back, or whether you've been permanently severed and discharged with no expectancy of coming back. So the fact that the employer discharged rather than laid off, even assuming they have a legitimate policy to operate only under a HF agreement, your theory is, well, they didn't have to discharge that was harsher than necessary. And that tends to show anti-union animus. Not only harsher, it was inconsistent with past practice. But then don't we have to, if that's the theory, there's also a lot of countervailing evidence about the contractors' efforts to bring these to make their facilities available to help that, to try to persuade the pipe fitters to cut some corners on their requirements. Why don't we consider all of that, too? Because the employer wasn't discriminating against the individuals as workers. In fact, the testimony was they wanted to keep the workers, they were the best available. What it shows is discrimination because they discharged them rather than keep them. They discharged them not because the contract terminated, they discharged them because they're going to sign with a new union. And in order to sign with a new union, they had to have a clean deck so that there wasn't this stumbling block of keeping these workers. There's an old court case called Austin and Wolf that decided in the decision which exactly this happened, where an employer terminated people. And the say, you have to terminate the employees, we're not going to sign with you. Yeah, but their determination was after the new union was in. That's the difference here. I can see, Your Honor, that that is a difference, that it wasn't until the day after they sent the letter that the pipe fitters first said to them, clearly, they have to be members, and they needed to hire through the pipe fitters hall, which meant the boilermakers who had been discharged would have to wait a more than a month before the first boilermaker, former boilermaker, was ever hired. But that was the way that Hawaiian Dredging, experienced in construction industry, implemented this policy of getting rid of boilermakers, which we say they had a right to withdraw recognition. But what Jack Welch, Simcoe, and those other cases teaches, you can go non-union, you can go open shop. I don't like that, but you have the right to it. But what you can't do in the process of going open shop, withdrawing recognition for another union is discharge the employees to effectuate that purpose. Sure, but they were not going open shop. It sounds like your argument between layoff and discharge is that they once again should have done what you call one of these gaps. They should have done another one of these gaps that you talked about, where they kept hiring or kept on payroll union members, even though they weren't working under an active AF contract. So you're saying they had other gaps, they should have had another gap here. That's what the layoff point is. I'm not sure it's a gap. What Simcoe teaches... It would have been another gap. You're saying is they should have, in the bridge between the two contracts, they should have kept the boilermakers on and working, if they simply had work, rather than terminated. I know we're quite that far. Okay. What I think Simcoe teaches is that was a situation where the retained some of them. And the union had said, you can retain them all. They retained some, hired some others, and the board found that was all discriminatory. Wind Raging had several choices. One, keep working, pay them whatever it wanted, and then sign with the pipefitters. And from that date forward, contract governance. This was some non-union employees too. The other alternative was to keep the gap, keep the boilermaker contract in effect, sign with the pipefitters, and then say, now as of today, you're pipefitters and you're working under the pipefit agreement. They couldn't keep the... You mean they would unilaterally just continue the prior contract? Is that what you're talking about? No. They couldn't terminate the contract with the boilermakers and continue all of it. They could continue to pay whatever wages they wanted. Once they terminated the agreement with the boilermakers, from then forward, they could keep the boilermakers welding and say, you can keep working. I'll pay you $80 an hour. They wouldn't be there for that interim period as AF employees? That's right. Well, they would be non-union employees. They could say to the boilermakers, look, we're not going to fire you. Right. They would have had to make a departure from their practice, like the gaps that you referred to before. Well, but they would not have had to make a departure from the past practice when there wasn't work available, just laying people off. They could continue to work. And I did have some times when there was no agreement in effect and they kind of expected to get one. I'm not disputing. That's probably what went on here. Your proposal almost seems discriminatory against pipefitters. It's almost like you're saying the law requires the employer to discriminate against the pipefitters union in favor of the boilermakers union. Because under your proposal, the pipefitters would not get to do what they normally do, which is decide who gets the job that day, who's whatever, most in seniority or whatever system they have with tests and etc. Your proposal would say to the pipefitters, the boilermakers get to jump the line and you have to use them before you start picking which pipefitters. That seems discriminatory against the pipefitters union. Well, that's the way it works. And that's what Austin and Will says, is that the new union can't say to the employer, we will only sign if you terminate the employees so we can then refer our members out of our home because that's here. They were already terminated. That's right. That you're saying that they weren't allowed to terminate. They weren't allowed to discharge. And if the effect of that think is because you want to force the employer to force the pipefitters to let the boilermakers jump the line. It's not jumping the line. It's giving them the right of not being discriminated against because they were boilermaker members by saying you lose your job because of your membership and you lose your job because we don't like the way your union acted in negotiations. You can't lose a job for it. Whether Brian Dredging chose to sign with the ironworkers, the pipefitters, the operators, go off and shop for a period of time or re-sign with the boilermakers. It's just a basic opposition that the workers couldn't lose their jobs because you're in. Thank you very much. We hear from the board now. Thank you. Good morning, Your Honors. Joel Heller from the National Labor Relations Board. After remand from this court, the board followed the court's instructions to consider certain credited evidence in the context of Section 8F. And based on that evidence, the board reasonably concluded that Hawaiian Dredging did not violate the NLRA and dismiss the complaint. And most of the arguments the boilermakers raised on appeal largely address matters not at issue in this case. The issue that is, the matter that is at motive. And motive is a question of fact. Substantial evidence supports the board's actual finding that the employees were discharged because Hawaiian Dredging's contract with the boilermakers had expired and not because of their boilermakers' status. This was pursuant to Hawaiian Dredging's longstanding practice of performing craft work only under a Section 8F collective bargaining agreement. Now, everyone agrees that it was lawful for Hawaiian Dredging to terminate its bargaining relationship with the boilermakers at the end of the contract. And everyone agrees that it was lawful for them, Hawaiian Dredging at that point, to cease operating work, or to cease welding work. That's what they did. And at that point, they had no, at least temporarily, had no need for these employees. And it was their decision what to do at that point, whether to lay them off, whether to discharge them, until there was a new contract in place. And then they restarted as per their typical contract. Did the board find that they had a business justification for choosing one over the other? The board found that this policy about only performing work under a CBA was a legitimate business justification of supporting the discharge. How does that support discharge versus layoff? It wasn't clear on that. That's the one thing I'm trying to figure out. Right. So what the board sort of said, whatever, they can choose, or at least the ALJ said they can choose between that. Essentially, that's your brief said the same. And it wasn't clear why that's true. Right. Essentially, that is the case. It is the employer had a choice whether to lay off or discharge because nothing in the NLRA dictates what that choice should be. The cases can't be discrimination, right? So long as it's not discriminatory. But when their letter says, Hey, we got to do this because your union won't work with us. Well, what then we all know they couldn't have been stopping welding for very long. They are a major contractor. So everyone had to know they weren't doing this for long. This was an interim measure. Yes. And so why isn't at least while the facts aren't the same as Austin, Austin Wolf, why? Help me understand why the discrimination concern your discharge because you're Boilermakers. And we're done with Boilermakers. We can't work with Boilermakers leadership. We're going to have to get another union in here. And so you're gone as opposed to you're we know the Austin Wolf rationale doesn't apply in that context. And I think it's the point you were making before is that in Austin Wolf and the the problem was the there was something wrong with the new contract with with the new union had made an unlawful request to discharge these employees. But that's not the case here because these employees were discharged before the new contract was signed. So you're saying the board, it just it seems to me an abstract out of it here. It was to me a little surprising that the board would think there's such a sharp timeline. You know, if it was five minutes before we sign this union, I want to label a five years here. So I'm with Union A not work and can't get to agree with them. And so five minutes before I signed the agreement with Union B, I discharged all the Union A people. Are we sure that Austin Wolf rationale wouldn't apply in that context? So it's less a timing issue than it's like, what is the nature of the violation at issue? Because in Austin Wolf timing can be a fact. Timing and circumstances are a factor in discrimination. Right. But I guess my point is that whether the question is the whether the discharge is unlawful is the question in this case, as opposed to whether the provisions of a of the new contract are unlawful, whether the discharges follow. Clearly, you could have unlawful conditions in a new contract. That's a separate question. Exactly. I'm focused on the scope of the circumstances that the board is willing to consider. And it's sort of Austin Wolf type analysis. Maybe that one was easy because the union was right there saying get rid of those people. Right. But I assume the board wouldn't be so facile as to say unless the unions right there on the record saying get rid of those people, we could never infer discrimination based on how close the timing was between the discharge and the new contract coming in. Is that wrong? Right. But again, it's the Is that right? I mean, they certainly circum they could they could do it. If a record here and I'm not suggesting this record, but on appropriate record, they could say, if there's a close, it's a short time gap between the two of them. Timing is certainly a relevant factor in a discrimination analysis. Yes. And I would think the sort of the was a one week or less between the two between the firing and the signing. Was it one week? It was even less than a week. It was six days difference here. The reason I'm asking this question. So you said timing matters. That's got to be pretty short. That's a pretty fast union negotiation for a new contract. Sure, sure. And so that's why I'm just reacting to your your argument that. The National Labor Relations Act says nothing about the choice between discharge and layoff, when in fact, I think the National Labor Relations Act says quite clearly. You may not choose discharge over layoff because of union membership. We agree on that. I agree. I agree with that. Right. And so and then that because that because of is the motive and becomes the factual inquiry. But that's why I was reacting to and a little curious about why the board was sort of so quick in this. They get to make that decision given the very close, unusually close timing. I know they argue about who knew what, when, but you know, six years, six days between we're done with your contract and a whole new contract is pretty fast, at least in the cases I have seen. Negotiations can go on for years sometimes. And so it seems to me when they say it didn't matter, that presupposes their answer on this. If there is no discrimination, it may not matter whether you discharge or layoff. Is that right? Yes. They had to make a determination that the reason they chose termination rather than layoff was for a business reason and not a discrimination reason. True, because they didn't find a business reason for the layoff. I'm sorry for the discharge rather than layoff. They didn't find discrimination, but they also didn't find a business reason. They left a gap in there. They did not find a particular business reason. I agree. We're doing the discharge versus the layoff. The reasoning is that it is the employer's choice in this circumstance, so long as it's not discriminatory, because the because of question would apply regardless of whether it was a layoff or a discharge. If these individuals had been laid off, we could be out there arguing that, well, this was a discriminatory layoff rather than a discriminatory discharge. The analysis is similar. If they are targeted because of their union activity, it doesn't really matter whether they were targeted as a layoff or targeted as a discharge. And it's also important to note that... Are layoffs ever worse than discharges? Are they ever worse than discharges? I'm not sure why it would be a discriminatory layoff rather than... You should have fired them. No, my point was not... Yes, I don't think anyone would be arguing that you should have discharged them rather than layoff. But if you had laid them off, there could have been a question, well, you shouldn't have actually taken any action against them. The layoff itself was discriminatory. You should have... There shouldn't be no adverse action against these. I didn't get to do something with them? That was the board's point here, is that they have... The employer had... Okay, so we didn't have an option C. I mean, I suppose the employer could have continued paying these employees to not do work, but I'm not sure they would have wanted to do that. And a point, though, about the layoff... One more point about the layoff versus discharge is that what happened here isn't all that different from what happens under other circumstances. The testimony you were pointing to, Judge Millett, at CA 155, of Falk Aona, he testified that in past times when there had been a slowdown in work and they were temporarily let go, but there was no guarantee that they were going to be brought back to be recalled to work. He says that he would... In past instances, he had not been told that he would have been recalled. And then when the time did come to come back to work, he was, quote, what has happened in the past. What happens to these employees here is similar to what has happened in the past. And it was a very... Again, we're talking about timing, a short break. As soon as this contract was signed, the same day it was signed with the pipe fitters, the employer, Hawaiian Judge, was reaching out to these former employees and said, we have a new contract, there's a way to come back to work if you want. We don't actually know what it is, you should contact the pipe fitters. And that's another point. These employees were never told that they had to become immediate members of the pipe fitters. They were told by this testimony by the Hawaiian Judging Official Forrest Ramey, that he didn't actually know what the practice was, they should contact the pipe fitters to find out the process they had to follow to come back to work. What might be a legitimate business justification for choosing discharge over layoff? What might... I don't wanna speculate too much, but I guess the... Well, again, this is me speculating, so there might be some... I'm just trying to... I understand there was no finding. I'm just trying to get a sense of why... Does that seem really inexplicable or does that seem like something one might expect in a situation like this? Sure. It hasn't happened in the past, I think, with this employer, as far as we know. Sorry, what is the it that hasn't happened with this employer in the past? That employees were discharged at the end of a contract. You just said that they were discharged. They still had to get... They were discharged, and I'm not sure how this terminology works in the ADEF context, but they had to go back. When the contract ended, they had to go back. They were done, they went on unemployment. This is what JA 155 says, went on unemployment, which I don't think maybe you can do in your layoff, but you went on unemployment, but you had to go back through the union hiring hall for your next job. Yes, that was in situations where there was no more work. It was not contract expiration situation. So there was still an ongoing contract, but the project had ended, so there was no work for these employees to do. That's what is being discussed at JA 155. And it's... So a no work situation is different than a no contract situation, or at least it could be. So there's different contracts, I guess it is. You're talking about the big ADEF contract? The ADEF... When you say no contract, you mean no ADEF contract. I do, right. Okay, I meant contract. Oh, I see. They contract with other businesses. That's where the word comes from, so... Okay. Yes, sorry. That is what I... So the testimony you talk about when they say they would get... They told that they're done, there's no work, go on unemployment, go back to union hiring hall is when there was no ADEF contract or when there was no subcontract for these purposes just to... When there was no, I guess, work contract with the client between Hawaiian Judging and the state of Hawaii or whoever, rather than situations like here where there was no ADEF contract because it had expired. Mr. Howell, let me try again to answer this question. Imagine you are a screenwriter and you're writing a movie about a law abiding employer. Realistic movie, law abiding employer owns a construction company and ADEF collective bargaining agreement expires. In the movie, you write this, I'm choosing to discharge the employees after the expiration of this contract because... What's a plausible rest of that sentence? Right. So the employer could decide it wanted to... Well, if it didn't want these employees anymore. I know, again, that's not the case here, not the facts of this case. But if they didn't want to recall the same employees, they just wanted a fresh start. And with a new group of employees, and maybe they didn't like those employees' welding skills, so they wanted someone new. So that would be a plausible explanation for discharge versus layoff. Again, not the facts of this case, but we're not... Right. So that's how I would answer the question in my... But they like their welding skills. They like their welding skills, as we know we did here. Right. And it still is hard to figure out a business reason for discharge rather than layoff, isn't it? I was hoping you'd finish the sentence with something that was not inconsistent, facts of this case, because they went out of their way... To help these Boilermakers... That is true. Get through the pipe fitting union hall... What do you call it? Hiring hall system. Hiring hall, yes. So, and if this... I'll keep trying to think of that one, but it may be an unsatisfactory answer, but an answer is that so long as the NLRA doesn't prohibit them from making one choice or the other, they're free to make that choice for whatever reason they would like to. But why did they want... Why did they do it here? I'm not asking why they did it here, if you can't read their mind. I'm asking why would a law abiding employer do it in a way that's not inconsistent with the facts? Right. So the employer may have thought that... Or an employer may have thought that... Oh. Sorry. The employer may have thought that it could have been something having to do with the unemployment situation in Hawaii. Again, I don't know anything about Hawaii unemployment law. Let me try it. Let me try the same question coming at the opposite end, from the opposite end of the telescope, which is... I'll just stipulate a motive in a hypothetical and tell me whether it's lawful or not, which is the employer sets up the ADEF contract, it expires. The employer fully intends and expects that a successor contract with a different union will be put in place in the relatively near future. That's what they want. They're happy with their workers. And the employer chooses layoff... Sorry, discharge over layoff just to facilitate negotiations of the successor ADEF agreement with the new union. Is that impermissible animus against the old union, or is that the employer doing exactly what ADEF allows, exactly what's baked into ADEF just to avoid, as Judge Walker said earlier, avoid a sort of hostility or disadvantage to the new union? I think that could be permissible. I'm not saying... You can't say that it would always be permissible. I think it depends. Since in this... It sounds like in this situation that there's kind of some understanding of what's already... We have an understanding of what's in the new contract. So, of course, they would have... They just think there'll be a new contract in place in a week because that's how things work. Right. And there's probably going to be one of these requirements that they get the new... They get folks to the new unions hiring on... Yeah, I suppose that could be permissible. Well, that would depend on what they... Why they thought it would facilitate contract negotiations. Right, I mean, there's... With the next union, right? That could be troublesome. There's always facts. There's always tricky facts. We have to figure out whether something is lawful or not. Sorry, spin that out a little bit. What would be a variation that would... Right. ...tend to make it more or less permissible? Well, I think when we have something like we had here, there was a claim that they passed a welding test in order to be dispatched by the pipefitters union. So, we're not getting into the sticky area of membership, but we're doing... Right, there's some other criterion that they have to pass to get the respondent... Get dispatched to the new contract. And I believe it is uncontested that the welding test requirement was fine. I think the Boilermakers say that at page 37 of their brief. So, if it's a situation like that and also like we have here, then I think that could be an explanation. I thought your original position in the briefs was that there's no practical difference on these facts between discharge and layoff. So, it doesn't matter whether they chose discharge over layoff. Is that still the position? I think that's true. Why do you think that's the case? Right, because of the point I was making before is that this is actually quite similar to how these things have happened in the past. I believe it's not an ADEF contract expiration situation, but the testimony we were discussing before with Paul Iona, where he was saying that in past instances when work had run out, they had been... I don't know if he uses the word layoff, but he is... Or discharge, but they're no longer working for Hawaiian Dredging. They go out on unemployment, and at some point, they get re-dispatched to Hawaiian Dredging. And that's what happened to the employees in this case, just filling layoff with discharge, because they were discharged on the 17th. They went out. I'm not sure if they collected unemployment, but they were subsequently re-dispatched, so through the pipefitters, to work at Hawaiian Dredging. So, it's actually very similar to what happened. What would have happened if they had been laid off? They would have been out of work for a little bit, and they would have had to be re-dispatched to the pipefitters, and they would have gone back to work at Hawaiian Dredging. You don't think they were out of work longer as a result of being discharged versus being laid off? I don't think so, or at least there's nothing in the record to suggest one way or the other. It took... There was some speculation that would have happened, regardless of what had happened, whether the boilermakers were, the employees were laid off or discharged, because they would have had to come through the pipefitters' hiring hall. They would have had to pass this welding test, and anytime there's, like I was saying, there's kind of a ramp-up period, and I think that would have happened either way. That's true. If you're laid off, you have to go through a hiring hall. I thought the point of being laid off in a normal sense, it's not totally clear what that record reference is talking about. Right. That is, if you just get called back, you don't have to go through the hiring hall, or you don't have to do a welding test. Well, the contract with the pipefitters says that they have to, and I'm not getting the language exactly right, but they have to be... No, but with the boilermakers beforehand, if they'd been laid off, so they're already employees of Hawaii Dredging, if they're just laid off, why would they need, then, to even go through the hiring hall? I thought that was the point of the difference between layoff and discharge. Just going on that testimony from Paul Ione, he uses the word redispatched. I don't know what that means versus layoff versus discharge. That's the problem. Well, after whatever happened to him, whether he was laid off or discharged... I know, but we're talking about whether layoff or discharge matters, so we don't, the fact we don't know whether that, that might have been a discharge. I don't believe it was a discharge, but I guess it's, perhaps it's true that he doesn't say one way or the other. Yeah, I don't, I don't remember if he says that. I'm just, I'm trying to understand what layoff means in the ADEF context. I would have thought, imagine you had a continuing contract, so you're not going between one union yet. If you're laid off, you go back to the hiring hall, you just go right back to the employers and they go, you know, contract ended, it's Thursday, but we'll see you Monday with a new contract. The new contract starts Monday, don't come to work on Friday because we don't have any work for you. I assume they just show up on Monday, they don't go back to the hiring hall. That would be my assumption, but I don't... So layoff could make a difference here. Well, I think there's, I think it does matter that there's a new union. I think that is... We just don't have a record on this. I don't have any idea how this works. We don't have any facts on this. We don't have a record on this because it's... We don't have a factual basis for saying that layoff versus discharge is the same in this situation. We just don't know. Okay. Let's say we don't know whether, even if we don't know whether they would have been the same. I think it's still the case, however, that, and I apologize, I'm kind of going in circles here, but the employer has the choice whether to layoff or discharge. I mean, this is a friendly question. I thought that the board said in its last decision on review that maybe discharge versus layoff matters in almost every context. But in this context, where an 8F contract, like the Barney Agreement, has expired, that there's no continuing contract, that layoff doesn't work any different than a discharge because the pipefitters will still have hiring hall requirements one way or the other. And whether you have laid someone off or discharged them, they're starting in the same place vis-a-vis the eyes of the pipefitters. And that's where I was starting at with my response to Judge Millett, that I think it does matter that there's a new union, a new contract, a new union. And that's what the board said. Yes. Yes. And there's no evidence to the contrary? Excuse me. No, there's no evidence to the contrary as to, I mean, the contract with the pipefitters talks about the employer must secure all employees covered by this agreement through the employment office of the union, of the pipefitters union. It doesn't say, doesn't make a difference between whether you were calling them from layoff or whether these are new employees or whether they're former employees who've been discharged. Does layoff affect seniority? Does layoff affect seniority? I'm assuming that the hiring hall, one of the factors they use for who gets to go out first is seniority. So are we talking about under the Boilermakers contract or the pipefitters contract? Well, you're either one. I thought there was evidence that one of the factors, at least under the pipefitters, included seniority. So in the pipefitters contract, well, two points. One is that any seniority accrued under the Boilermakers contract is no more after the startup with the pipefitters contract. So I don't think for that. Even if you're laid off, only laid off by Hawaiian, that's what I'm asking. I believe that is true. And that's because it says that in the pipefitters contract, even if you were laid off by Hawaiian dredging. Because the contract under which you have accrued the seniority is no more. So your terms and conditions of employment, including seniority, are now governed by a new. I get that if you're terminated. I'm just, if I'm still an employee of Hawaiian dredging. So then let me get to my second question, is that under the pipefitters contract, there is a seniority-based dispatch system. And what it talks about is, it's based on your service with a signatory employer. And so Hawaiian dredging is now a signatory employer to the pipefitters contract. So it doesn't talk in terms of seniority with the pipefitters. It talks about seniority. Seniority with the company, with Hawaiian dredging. If you're a current employee, laid off, but you're still a current employee of Hawaiian dredging, that's going to count towards your seniority. So I think, one, we're getting farther afield from the record. So it's just that there was an argument that there was no difference here. And yet we're struggling with how we know that. And while the board might have said something, it sounds like from what you're telling me, we don't actually have a lot in the record. Now, we can argue about whose fault that is, that we lack the information in the record. But it's a decision the board made. So it had to have substantial evidence to support its finding. If we had to rely on that, that there was no difference. If we had to rely on that, there'd have to be substantial evidence. Because that finding is very much challenged by petitioners in this case, that there was no difference. So I think one thing you said is that if you are to rely on that, but I don't think you have to rely on that. It's because of the other argument the board's making, that it is the choice. It is the employer's choice whether to discharge a layoff, so long as it is not a discriminatory choice. And if you're with us on that one, I don't think you have to get to the second point about, oh, it doesn't matter whether it's a layoff or discharge. Practically, it's the same thing. I think you could go on either of those theories. Okay. One last question. Is there anything in... Assume that there was a layoff rather than a discharge. Is there anything in 8F that would require the pipe fitters to give more credit to these welders based on that distinction? Is there anything that would require... Or in the NLRA... We're talking about for seniority purposes? For whatever purpose. Nothing in the statute itself. Nothing in 8F. 8F certainly allows these types of agreements where a new union can come in and require that everyone become dues and fees paying members of that union. If I could just make one more point in response to something that was said earlier, and I'll be quick, is that there's no legal requirement that an employer give these employees an offer that they continue to work during the switchover. The cases that are cited by the biomakers in their brief, Jack Welsh and all those, it's about the issue there was that the employer... The stated reason of the employer for those discharges is that it said, oh, these employees were just going to quit anyway because I know they're not going to work in a non-union shop. And so I fired them. And the board didn't believe that. They said, you can't just make that decision for them. You have to give them the opportunity to quit. And so it was a response to the employer's argument in that case. It wasn't a legal proposition that applies all the time. Thank you very much. Thank you. Thank you, Judge Millett and Judge Katsas. You framed this question perfectly. Judge Katsas, I can see that there are circumstances where an employer can do what you suggest. Say to the workers, I'm pausing my business for a period of time. There's no more work for you. I'm not doing any work. You're discharged. Go file for unemployment. Go back to your hall. Seek work elsewhere or work non-union. And then at some point, sign an agreement with another union. Begin the hiring process again. Judge Millett, on the other hand, points out that in this case, it wasn't the week. It was the next day on February 18th that Hawaiian Dredging met with the pipefitters and began the process of signing the agreement. There were no negotiations. They just signed the association agreement that the pipefitters had in Hawaii. They signed it a week later with an understanding that if the board reversed the signing, they'd void it. So it's that instantaneous. But this was a day when they met with the pipefitters. We suggested that they knew before the 18th they were going to meet. But they met that day. They actually reviewed the record shows. They went to the training center and looked at the training center. The timing makes a lot of difference. So they went to what center? The pipefitters had a very established training center. Training center. And so apparently there was a tour given at the training center that very day. They met with the pipefitters on the 18th. The board's on the 19th, but Valentine says it was the 18th. And then signed the agreement on the 23rd. The timing is important here because discharge meant, to use the term, it facilitated, that is allowed Hawaiian judging to sign an agreement with the pipefitters, which then, I don't want to say it froze up, but preferred all the pipefitter members who were on, as my opponent points out, a seniority-based referral system. I want to be clear about something here, that their referral system favored people who had many hours in the industry, and then worked down this sort of seniority system. But I do want to clarify something, because I think there's, there is no seniority under the pipefitters agreement or the boilermakers agreement in terms of your work. Normally a collective bargaining agreement would say, if you worked for 20 years, you have more seniority over the worker who had 15. There is no seniority. Hawaiian judging under pipefitters or boilermakers could lay people off without regard to seniority. So the length of time working for Hawaiian judging was not a lot of consequence here, except for the fact, this is contrary to what Judge Walker is raising, that Hawaiian judging did make every effort to retain these people and ask the pipefitters to keep them. But Austin Bull says that the pipefitters couldn't impose a requirement  that your honor does protect the section seven rights of the boilermakers who had had a union of their choice, or even to be non-union, protects that right, as opposed to a new union that wants to interfere with it. I'm sorry, so what made this an unfair labor practice was Hawaiian dredging's effort to get these workers rehired? No, but what that does is it undermines the argument that they had to discharge them because they had good reason to keep them. They wanted to keep them. It undermines their argument that they didn't just follow some past practice of either laying them off or keeping them. All right, so it undermines, and I think that the bottom line from my point of view, if I may conclude, is that when I started this case and I saw a letter that said, back in 2011, 11 years ago, dear union, we're terminating the relationship with you because you've been a bad partner, you haven't negotiated. It sounds like they're terminating the agreement because the union hasn't negotiated. But we know the underlying reason was there were some strikes by the union and the workers. And then the letter said that we're not going to hire members of the border makers union. And that stuck out to me to be an admission that it's a membership-based decision that we're not going to hire border makers anymore. And I think that's what caused this case to kind of have this length of time because on its face, Hawaiian dredging's reason is tied to membership, which as we know in the record is what happened here. Mr. Roosevelt, I know we're long into this argument. I am still confused about the practical difference in this specific context between layoff and discharge. Can you tell me where to go in the record where I can see that these boiler maker employees would have been better off under the pipe fitters hiring hall priority system? If they had been laid off rather than discharged? I can't honestly answer that question because I don't understand the pipe persistence and I'll represent them. All I can say is it does say, the counsel for the board points this out, that if you have 10,000 hours working for a signatory, you get a preference. And if they're laid off, arguably that suggests that many of these workers who had many more than 10,000 hours of working for Hawaiian dredging before it's signed with the pipe fitters would have that preference. I don't know. It's not in the record. It's just speculation on my part. I will concede. You lose that preference if you're discharged because you would still be able to say, I've worked more than 10,000 hours for them. Right. It seems key. I mean, that seems to be the key to why in this weird context, this weird fact pattern, there may have been no practical difference between discharge and layoff post what the bargaining agreement with the pipe. The discharge, the difference was I've been working, some of these workers have worked Hawaiian dredging for 25 years, 20 years, 15 years. They're working on projects. They're told they're discharged. They're gone. They have no more employment. Shook your hand. Here's your last paycheck. You're out of here. Because I'm a member of a union. From their perspective, when that happens, they have no choice but to think it's their union membership that has caused their discharge. Now, events later played out that that did have an impact because the boilermakers in later went through the hiring hall process of the pipers, including Jordan, didn't start work until March 23rd, I think is the first date. So they lost some time. There's nothing in the record that shows they would have started on March 13th rather than March 28th if they had been laid off rather than discharged. There is something in the record because we have the dispatching records from Hawaiian dredging, and we know they dispatched some of their current members on their out-of-work list first. And we do know that whatever it took, the first boilermaker who's, some were on the list before March 23rd, but the first date any of them was dispatched was either March 21 or March 23rd. They still had to pass the pipe fitters test. They still had to do some of these requirements, but the legality of those requirements is not challenged. There's nothing in the record that says once they checked all the boxes that the pipe fitters required them to check, they would have been able to start earlier than they did if they had been laid off rather than discharged. That is true from the pipe fitters' point of view, that they would have been on the out-of-works the same day. But the pipe fitters aren't accused of the unfair labor effect. The accusation here is the Hawaiian dredging. I'm just confused. Just to get back to your answer, do we know on this record that if you're laid off, the hiring hall is for new positions. You've got enough existing welders, you don't go to the hiring hall. You've got enough people there already. Do we know, maybe this is just how it works, do we know that if you're laid off, you have to go through the hiring hall or you just get called back by your employer? We don't know. We don't know. We do not know. So they might not have had to go through the testing and all that kind of thing. We just don't know. No, we do know for, I'm sorry, I'm going to answer this from two perspectives. We don't know from the boilermakers in the past whether if Hawaiian Dredging laid me off. I don't care about the boilermakers. What I want to know is in this situation, if they had laid them off when their work ended, because they expected to have work again within a week or two, if they had laid them off rather than discharged, would they have, I had thought from your, maybe I just misread your brief, I had thought the point was you wouldn't have to go through all this rigmarole with pipe fitters if you had just been laid off because you would already be an employee of Hawaiian Dredging. No reason to go to the hiring hall. We have folks on board already. Maybe they have to go ahead and do some paperwork with them, pay some fees or something, but they wouldn't have to get cleared through a hiring hall. The hiring hall is for new needs, not when your existing needs aren't filled. Our position is, Austin and Wolf, if the company... No, what is your factual answer? I don't want a legal answer. Austin and Wolf doesn't tell me about this. Factually, no. Factually, if the company had laid them off, the pipe fitters from day one insisted that layoff or discharge makes no difference to us. You still have to join the... Would that have been lawful? It would have been lawful if they were not, had no expectation of employment, had not been discharged for the pipe fitters to say any new employees have to go through our referral system. Right, but if you're laid off, you're not a new employee. That's where I'm confused. All right. So the difference here is that Hawaiian Dredging could on the 17th, you know, whenever they drafted the letter, they knew on the 15th actually they'd been dismissed because that's the date that Harry Marr's office received it. But they could have said to these workers, we're going a new direction. You're all being laid off. We are not going to work until we sign a new agreement. You're arguing for this, right? Your brief is that they should have been laid off, not discharged. So your argument is that they would have said that to them. Well, because in this fact pattern, as they laid them off, they would be saying to them, we're not getting rid of you permanently. We're not saying you're done with Hawaiian Dredging. We're just saying we're going a new direction. In fact, we're going to sign with someone else and then we'll deal with rehiring you. And then the question is, what would the pipefitters have done? If the pipefitters had said, okay, anyone who's a layoff can come back first. We'll let them go back to work. Or the pipefitters could have said, sorry, you can't rehire them because you've got to go through our system again. And that's what Austin Wolf says, Judge Walker, that the pipefitters can't do. They can't or cannot. They cannot. They cannot say to an employer, you've got workers who are currently working or laid off. You have to fire them. Give preference to our people. That seems like a simple answer to my question, which is, had they been laid off as a matter of law, they wouldn't have had to go to the pipefitters hiring hall. The pipefitters would have insisted they go through the hall, yes. But that would have been unlawful. Yes. All I'm asking you is, as a matter of law, they would not have had to go through the hiring hall? No, not, I'm sorry. As a matter of law. The law wouldn't have allowed the pipefitters to say you still have to go through our hiring hall. I assume that's what, you're the one who raised the, they should have been layoff rather than discharge. You must have done it for a reason. Yes, yes. Austin Wolf says you can't discriminate by having a new union condition employment on current employees or laid off employees by going to the hiring hall. You cannot condition them. That's what Austin Wolf says, and has been reaffirmed since then, that the new union can't say you got a group of workers, you got to discharge them in preference to our members. You got a group laid off. You can't disadvantage them in preference to our members who are referred to displace them. Thank you very much. Thank you very much. I'm sorry, that case is submitted.
judges: Millett, Katsas, Walker